IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BERTHA A. GONZALEZ, | § |
| | § |
| Plaintiff, | § |
| | § |
| V. | §    CIVIL ACTION NO. H-11-4241 |
| | § |
| MICHAEL ASTRUE, COMMISSIONER OF | § |
| THE SOCIAL SECURITY | § |
| ADMINISTRATION, | § |
| | § |
| Defendant. | § |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment and Brief in Support (Document Nos. 13 & 14) and Plaintiff's cross Motion for Summary Judgment and Memorandum in Support (Document No. 19). After considering the cross motions for summary judgment and briefing, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

---

[1] On March 12, 2012, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 12.

## I.       Introduction

Plaintiff Bertha A. Gonzalez ("Gonzalez") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). Gonzalez argues that: (1) the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence; and (2) the ALJ's credibility determination is not supported by substantial evidence and is the result of legal error. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II.      Administrative Proceedings

On June 8, 2009, Gonzalez applied for disability insurance benefits and supplemental security income benefits, claiming that she has been unable to work since June 22, 2007, as a result of a left hand injury, hypertension, depression and anxiety. (Tr. 139-149; 176; 208). The Social Security Administration denied the applications at the initial and reconsideration stages. After that, Gonzalez requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Allen G. Erickson, held a hearing on July 28, 2010, at which Gonzalez' claims were considered *de novo*. (Tr. 37-87). On August 25, 2010, the ALJ issued his decision finding Gonzalez not disabled. (Tr. 21-33).

Gonzalez sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following

circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.  After considering Gonzalez' contentions in light of the applicable regulations and evidence, the Appeals Council found no basis upon which to grant Gonzalez' request for review.  (Tr. 1-3).  The ALJ's decision thus became final.

Gonzalez has filed a timely appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The parties have filed cross motions for summary judgment (Document Nos. 13 & 19).  The appeal is now ripe for ruling.

## III.    Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision  of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable,  *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor

3

substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).    The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

4

limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Gonzalez had not engaged in substantial gainful activity since June 22, 2007, her alleged onset date.  At step two, the ALJ found Gonzalez had the following severe impairments: status-post left wrist surgery, DeQuervain's tenosynovitis, hypertension, obesity, depression and anxiety.  At step three, the ALJ concluded that Gonzalez did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  The ALJ then, prior to consideration of steps four and five, determined that Gonzalez had the residual functional capacity ("RFC") to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot climb ladders, ropes or scaffolds.  She is unable to use her left non-dominant arm. Additionally, she can understand, remember, and carry out detailed but not complex instructions." (Tr. 26).  Applying that RFC, the ALJ found, at step four, that Gonzalez could not perform her past work as a machine operator, which was semi-skilled, medium work.  At step five, using that same RFC, and considering Gonzalez' age, education, and work experience, the ALJ concluded that there were jobs in significant numbers in the national and regional economy that Gonzalez could perform, including school bus monitor, information clerk and garment sorter, and that she was, therefore, not disabled.

In this appeal, Gonzalez challenges the ALJ's RFC determination, his credibility determination, and his determination at step five that she can engage in other substantial gainful activity.  In particular, Gonzalez argues that the ALJ's RFC determination is not supported by

substantial evidence because there is no evidence in the record that Gonzalez can lift, with either her right arm/hand alone, or with her right and left arms together, twenty (20) pounds occasionally, and ten (10) pounds frequently, as is required for light work.  In addition, with respect to her mental limitations and how the ALJ factored them into her RFC, Gonzalez argues that the RFC, which limited her to detailed, but not complex instructions, did not adequately take into account the evidence in the record that she has moderate difficulties maintaining concentration, persistence and pace.  With respect to the ALJ's credibility determination, Gonzalez argues that the ALJ focused on minor inconsistencies and improperly used her inability to afford treatment against her.

In determining whether substantial evidence supports the ALJ's decision, including his RFC assessment and his credibility determination, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age.  *Wren*, 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

A review of the lengthy record[2] shows that it is Gonzalez' left wrist impairment which serves as the foremost basis for her disability claim.  While Gonzalez suffers from other impairments which

---

[2] The administrative record consists of 826 pages.  Despite that length, many of the medical treatment records related to Gonzalez' left hand impairment appear multiple times.  In addition, a significant portion of the record, pages 546-765, are general medical records that are dated from December 14, 2001 through May 18, 2004, well before Gonzalez' alleged onset date, and irrelevant to Gonzalez' left hand injury.

the ALJ found to be severe, including hypertension and obesity, it is Gonzales' left wrist, and the resulting issues of anxiety and depression that were the focus of the administrative hearing, and are at issue in this appeal.

In October 2006, while employed as a machine operator, and while she was carrying a metal plate, Gonzalez suffered an on-the-job injury to her left, non-dominant wrist. She was seen by Dr. Hugo R. Gonzalez at the Industrial and Family Practice Clinic from October 27, 2006, through December 29, 2006, for what Dr. Gonzalez characterized as a left wrist "sprain". (Tr. 313-320).

When the tenderness and pain did not abate, Gonzalez saw Dr. David C. Randall of East Houston Orthopedics and Sports Medicine on January 11, 2007. (Tr. 236). Gonzalez complained at that first visit of severe pain in her left wrist. (Tr. 236). Upon physical examination, Dr. Randall found no swelling or signs of infection, but there was a decreased range of motion in her left wrist flexion, extension, ulnar deviation, and radial deviation. (Tr. 233-234; 236). In addition, while the radial and ulnar nerve functions were intact, Gonzalez was only able to make a clenched fist with difficulty, and there was a positive Finkelstein's test.[3] (Tr. 233-234; 236). Dr. Randall diagnosed Gonzalez with DeQuervain's tenosynovitis, ordered an injection to the first dorsal compartment, put Gonzalez' left thumb in a spica brace, and restricted Gonzalez to lifting no more than five (5) pounds with her left hand. (Tr. 233-234; 236; 246).

At her next visit with Dr. Randall on February 12, 2007, Gonzalez reported that she had some improvement after the injection, but she did not like the thumb brace because her thumb tended to stiffen. (Tr. 237). Upon physical examination, Dr. Randall found that she had no swelling, redness or real point tenderness over the first dorsal compartment, but there was a mildly positive

_____

[3] Finkelstein's test is a test designed to diagnose DeQuervain's tenosynovitis.

Finkelstein's test and she had a slight decrease in her range of motion and grip strength.  (Tr. 237).

Dr. Randall released Gonzalez back to work without any restrictions. (Tr. 237; 245).

Gonzalez was next seen by Dr. Thomas E. Martens, a family practice physician, on March 22, 2007, for a "designated doctor examination" in connection with Gonzalez' on-the-job injury and associated workers' compensation claim.  (Tr. 327-334).  At the evaluation, Gonzalez complained of having constant pain in her left hand and fingers, with her current pain being at a level 8 on a scale of 1 to 10.  (Tr. 329).  Upon examination, Dr. Martens found swelling at the "thenar aspect" of Gonzalez' left hand, a decreased range of motion, and 1/5 muscle strength on the left.  (Tr. 329, 330-331).  Dr. Martens opined in a letter to the Division of Worker's Compensation that Gonzalez had not reached "maximum medical improvement" and that she should be seen by an orthopedic  hand specialist.  (Tr. 332).  In the interim, Dr. Martens prescribed a wrist splint and allowed Gonzalez to return to work as long as she did not use her left arm.  (Tr. 333; 325).

Gonzalez returned to Dr. Randall on April 23, 2007, having missed a prior appointment on March 19, 2007.  (Tr. 237-238).  On that date (April 23, 2007), Gonzalez complained of diffuse pain in her left wrist, localized to "the radio styloid as well as the dorsal and volar aspects of her wrist." (Tr. 237).  While she reported that the prior injections had helped somewhat, the relief was temporary.  (Tr. 237).  Upon examination, Dr. Randall found that Gonzalez had diffuse tenderness to palpation and "specific tenderness localized to the first dorsal compartment."  (Tr. 237).  Her grip strength was weak and she has a positive Finkelstein's test.  (Tr. 237).  Dr. Randall again diagnosed Gonzalez with DeQuervain's tenosynovitis of her left wrist and recommended a first dorsal compartment release.  (Tr. 238).  That procedure was done by Dr. Randall on May 9, 2007 (Tr. 235), with Dr. Randall noting two days later that the surgery "went well" and that it would "be about six

weeks before [Gonzalez] can return to her regular activities without restriction." (Tr. 232).

In a follow-up visit on May 14, 2007, which was precipitated by a phone call from Gonzalez to Dr. Randall's office about her hand being cold and blue, Dr. Randall found that Gonzalez' left hand was warm, had excellent capillary refill, and there were no signs of any wound healing problem. (Tr. 238). Gonzalez was, at that time, "adamant that she cannot go back to work even with light duty," but Dr. Randall found that "unrealistic" given the objective findings from his physical examination of Gonzalez' left wrist. (Tr. 238). Instead, Dr. Randall "suggested that she go back into her thumb spica brace and not lift anything more than 2 lbs." (Tr. 238, 241). Gonzalez missed her next scheduled appointment with Dr. Randall on June 11, 2007. (Tr. 239-240). During that time frame, however, it appears that Gonzalez saw James Costello, a chiropractor.

In a note dated May 24, 2007, Gonzalez complained of continuous pain, and sought "another opinion." (Tr. 368). An examination of her left hand revealed swelling and tenderness. (Tr. 368). Persistent DeQuervain's disease was diagnosed and Gonzalez was prescribed a splint as well as Meloxicam and Vicodin. (Tr. 368). At follow-up visits on June 8, 2007, and June 22, 2007, there was swelling, tenderness, and a decreased range of motion in her left wrist. (Tr. 366, 367). Consultation with a hand surgeon and progressive therapy was recommended. (Tr. 366, 367). In a comprehensive medical report summary and request for "pre-authorization for s/p surgical outpatient PM&R-PT" dated July 23, 2007, Costello reported Gonzalez' complaints of "pain, numbness, burning, cramping and loss of use of her left hand and thumb" and noted that she had "demonstrable deficits to AROM, strength, prehension, stereognosis and general use of her left hand." (Tr. 356-357; 360-365). He recommended extensive physical therapy (Tr. 358-359) and opined that Gonzalez "could return to work in a restricted capacity of no use of the left arm." (Tr.

10

357).

Gonzalez was next seen, on August 8, 2007, by Dr. Jerry M. Keepers of Advanced Invasive Pain Management of Houston, upon the referral of Dr. Costello. (Tr. 340-344). Dr. Keepers reported Gonzalez' complaints with her left wrist, and stated that he was to "provide her pain medication as she goes through rehabilitation." (Tr. 340). He prescribed Relafen and Vicodin. (Tr. 344). On that same date (August 8, 2007), a functional capacity evaluation was done, although it cannot be ascertained from the record at whose direction the evaluation was done. (Tr. 345-353). Nonetheless, the August 8, 2007, evaluation showed that Gonzalez had deficits in the range of motion in her left wrist, and was unable to perform a dynamic floor to knuckle test due to an inability to firmly grasp and hold onto the cart with her left hand because of complaints of severe wrist pain and weakness. (Tr. 346). The evaluator believed that Gonzalez demonstrated maximum effort, but was unable to "perform occupational grasping, squeezing, lifting and pushing and pulling requirements" and she had a "[h]igh subjective  pain level associated with frequent fine hand manipulation or general acts of daily physical activity." (Tr. 346). The evaluator concluded that Gonzalez performed at a "sedentary PDL" but was unable to return to her job as a machine operator, "which requires a medium PDL." (Tr. 346). In a status report to the Texas Worker's Compensation Commission, Gonzalez was allowed to return to work, but with the restriction of "no use of [left arm/hand." (Tr. 355).

Throughout the remainder of 2007, until April 17, 2008, Gonzalez was periodically seen by Dr. Keepers for medication management, while her requests for enrollment in a chronic pain management program were being made and considered. (Tr. 475-478; 471-474; 466-470; 461-465; 456-460). Then, on April 17, 2008, Gonzalez was seen by Dr. Robert Kratschmer, at the Surgery

11

Specialty Hospitals of America.  (Tr. 251).  On that date, Dr. Kratschmer found that Gonzalez had

a positive Tinel's sign, and a positive Finkelstein's test at the site of the previous incision on the

extensor side of her left wrist.   (Tr. 251).   Dr. Kratschmer's clinical impressions from his

examination were a "possible recurrence [of Gonzalez'] deQuervain's, possible neuroma of [the]

branch of [the] radial nerve," resulting in a planned surgical "exploration of the wound site, a

possible release of the first dorsal compartment, and a possible excision [of a] neuroma." (Tr. 251).

In an outpatient procedure conducted on April 17, 2008, Dr. Kratschmer performed a release of the

first dorsal compartment, a tenosynovectomy of the APL and EPB tendons, a neurolysis of the

sensory branch of the left radial nerve, and an application of a short-arm splint.  (Tr. 256-257).

During the procedure, it was noted that:

> there was a significant amount of scar tissue in the surrounding area and the branch
> of the radial nerve was entrapped in the scar.   Once it had been released using
> tenotomy scissors, the nerve was noted to have good reperfusion of the nerve.
>
> Further exploration at the first dorsal compartment noted that the dorsal compartment
> had reattached itself and it was no longer released so tenotomy scissors were then
> used to open up the first dorsal compartment again and there were noted to be
> multiple slips of the APL tendon.  Each one of these were also released from the first
> dorsal compartment.
>
> Further, there was some inflammatory tenosynovitis which was then excised with
> tenotomy scissors and good excursion of the APL and EPB tendon was then noted
> once the first dorsal compartment had been released.

(Tr. 257).  There is no evidence in the record as to any follow-up visits related to this surgery.

Instead, the next time the record shows that Gonzalez was seen was on August 25, 2008, for a

designated doctor re-examination.  (Tr. 415-420).

On that date, Gonzalez was seen by Dr. Charles F. Xeller.  (Tr. 415-420).  At that evaluation,

Gonzalez continued to complain of considerable pain in her left wrist. (TR. 416).  The scar appeared

12

"rather red and irritated" and Gonzalez had "considerable pain over the first dorsal compartment."

(Tr. 416).  Upon examination, Dr. Xeller found that Gonzalez had

> decreased wrist range of motion – 10 of extension on the left.  No ulnar, with normal radial and flexion of 60.
> Thumb motion, MP flexion 30; IP flexion is 30.  Still a very positive de Quervain's.
> Still tender with a positive Tinel's over the scar where she had the first dorsal compartment release.

(Tr. 418).  With respect to the neurovascular functioning of her left hand/wrist, Dr. Xeller noted that there was "no thenar, hypothenar or intrinsic atrophy.  There [was] no numbness of the fingers, although she [had] some numbness in the dorsal aspect of her thumb and index finger in the distribution of the dorsal sensory branch of the radial nerve."  (Tr. 418).  As for grip strength testing, it was "80/80/80 versus 10/15/10, but she has giving way secondary to pain."  (Tr. 418).  Based on her history, her complaints, and the physical examination, Dr. Xeller opined that Gonzalez had reached maximum medical improvement and assessed a 13 percent whole body impairment rating.  (Tr. 419).  Dr. Xeller also opined that Gonzalez "could work right-handed work, using the left hand only as a helper hand, with no appreciable gripping or twisting or lifting with the left side."  (Tr. 419).

Following Dr. Xeller's evaluation, Gonzalez was again seen by Dr. Keepers for medication management on October 8, 2008 (Tr. 451-455); January 14, 2009 (Tr. 446-450), January 28, 2009 (Tr. 441-455), February 25, 2009 (Tr. 436-440), and March 25, 2009 (Tr. 431-435).  On February 12, 2009, Gonzalez was seen by her family practice physician, Dr. Guoxiang, with complaints of dizziness, anxiety, crying, and headaches.  (Tr. 281).  Dr. Guoxiang discussed medication options with Gonzales, and prescribed Xanax.  (Tr. 281).

On March 25, 2009, a second functional capacity evaluation was done.  (Tr. 297-304).

Again, the record does not clearly reveal at whose behest this evaluation was done.  On that date, Gonzalez still had significant deficits in her range of motion in her left wrist. (Tr. 298).   However, unlike the previous evaluation, she was able to "dynamic lift 20 lbs from the floor to knuckle and shoulder test.  Ms. Gonzalez also demonstrated the ability to dynamic carry 20 lbs for a distance of 15 feet each way. . . . [and] demonstrated the ability to static push at 27.6 lbs. And pull at 24.9 lbs. (Light PDL) [with] [Gonzales] provid[ing] consistent effort during testing."  (Tr. 298).   The evaluator concluded from the results that Gonzalez could not "perform frequent occupational lifting requirements (Medium PDL), but had "performed at a light PDL throughout the evaluation with complaints of severe wrist pain" and "would benefit from a work hardening program." (Tr. 298).

When next seen by Dr. Keepers on April 22, 2009, he noted that Gonzalez had been approved for approved for a work hardening program, and that the work hardening program, along with a weaning of her medications, was designed to "enable [Gonzalez] to return to some type of gainful employment." (Tr. 290-294). The remainder of the medical record relative to the impairment to her left wrist consists of visits by Gonzalez to Dr. Keepers for medication management and weaning on May 6, 2009 (Tr. 421-425), September 9, 2009 (Tr. 819-822), October 14, 2009 (815-818), November 13, 2009 (Tr. 812-814), and December 11, 2009 (809-811).  By her last visit with Dr. Keepers on February 9, 2010, Gonzalez had completed 20 sessions of a work hardening/chronic pain management program, had been weaned off her medications, had been prescribed an over-the-counter anti-inflammatory, and had been advised that no further surgical intervention was recommended and that there was no further treatment that could be offered to her.  (Tr. 806-808).

As for her depression and anxiety, Gonzales was evaluated by Dr. Danielle Hale, a licensed psychologist, on October 22, 2009.  (Tr. 782-785).  On that date, Gonzalez, who drove herself to the

14

appointment, reported that her sleep was poor, she had no energy, and she had lost interest in daily activities. Gonzalez also reported that she was able to take care of her personal needs, but could not cook or clean without assistance. Her reported daily activities consisted of "'lying around watching TV.'" (Tr. 783). A mental status examination revealed that Gonzalez appeared lethargic, but was forthcoming with information, her eye contact was good, her speech was understandable, her thought processes were logical and goal-directed, there was no evidence of loose associations, flight of ideas, circumstantial or tangential thinking, and she reported no hallucinations and no suicidal or homicidal ideations. (Tr. 784). Her mood, however, was depressed and her affect was flat. Gonzalez was diagnosed with a mixed anxiety-depressive disorder, and she was assessed a GAF of 60. (Tr. 785). With treatment, her predicted prognosis was good. (Tr. 785).

The objective medical evidence, considered as a whole, supports the ALJ's determination that Gonzalez, despite her impairments, can engage in substantial gainful activity. In particular, as determined by the ALJ, the objective medical evidence supports the ALJ's conclusion that Gonzalez' impairments do not meet or equal a listed impairment, supports the ALJ's determination that Gonzalez cannot perform her past work as a machine operator, which is semi-skilled, medium work, and supports the ALJ's RFC determination. In that regard, the objective medical evidence supports the ALJ's conclusion that Gonzalez cannot use her left arm/hand, but her right, dominant arm/hand is unimpaired. In addition, the objective medical evidence supports the ALJ's conclusion that Gonzalez has the ability to understand, remember and carry out detailed but not complex instructions. The objective medical evidence factor supports the ALJ's decision.

15

B.        **Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

Here, there are two expert medical opinions in the record as to Gonzalez' physical limitations, and one expert medical opinion as to Gonzalez' mental limitations.[4]  Each opinion supports the ALJ's determination.  With regard to Gonzalez' physical limitations, Dr. Xeller opined

---

[4] Danielle Hale, Ph.D. conducted a psychological evaluation of Gonzalez on October 21, 2009.  While that evaluation contains the findings of a mental status examination, there are no opinions from Hale as to Gonzalez' mental ability to engage in work related activities.  (Tr. 782-785).

following a consultative examination he conducted on August 25, 2008, that Gonzalez "could work right-handed work, using the left hand only as a helper hand with no appreciable gripping or twisting or lifting with the left side." (Tr. 419). Similarly, Dr. Costello, a chiropractor, opined on July 23, 2007, that Gonzalez "could return to work in a restricted capacity of no use of the left arm." (Tr. 357). As for Gonzalez' mental limitations, Dr. Mark Boulos opined, following his review of Gonzalez' medical records, that Gonzalez could "understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work settings." (Tr. 803). As the ALJ's RFC determination is consistent with the expert medical opinions in the record, this factor also supports the ALJ's decision.

### C.    Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Gonzalez testified at the hearing before the ALJ on July 28, 2010, that she injured her left wrist in October 2006, and was subsequently "let go" by her employer in June 2007. (Tr. 50-51). Gonzalez testified that she has pain in her left hand and sometimes cannot bend her fingers. She rated her pain a 7-9 on a scale of 1 to 10. (Tr. 55). She wears a splint, and is basically a one-

handed/one-armed person.  (Tr. 58-59).  Her injury and the loss of her job have caused her a lot of

anxiety and depression, but she hasn't sought mental health treatment because she lost her insurance

and cannot afford it.  (Tr. 57, 70).  Gonzalez' daughter, Karina Ariaga, also testified at the hearing

about Gonzalez' condition.  She testified that she visits her mother every day and takes her mother

wherever she needs to go.  She also testified that her mother does not do anything with her left arm,

she is always wearing a splint or brace on her left wrist, and she is depressed because she can't pay

her bills.

The ALJ discounted Gonzalez' claim, and her testimony that her left arm/hand impairment,

her anxiety/depression, and the subjective symptoms associated therewith, precluded her from all

substantial gainful activity.  In so doing, the ALJ determined that Gonzalez' subjective complaints

were not fully credible.  The ALJ, in his written decision, addressed, in great detail, Gonzalez'

complaints, her testimony at the hearing, the testimony of Gonzalez' daughter, and the objective

medical evidence.  (Tr. 26-28).  In addition, the ALJ cited to the relevant regulations on the

assessment of a claimant's credibility and pointed to evidence in the record that supported his

credibility determination.  In so doing, the ALJ wrote:

> Because a claimant's symptoms can sometimes suggest a greater level of severity of
> impairment than can be shown by the objective medical evidence alone, 20 CFR
> 404.1529(c) and 416.929(c)(3) describe the kinds of evidence, including the factors
> below, that the undersigned must consider in addition to the objective medical
> evidence when assessing the credibility of the claimant's statements:
>
> 1.       The claimant's daily activities;
> 2.       The location, duration, frequency, and intensity of the claimant's pain or other
> symptoms;
> 3.       Factors that precipitate and aggravate the symptoms;
> 4.       The type, dosage, effectiveness, and side effects of any medication the
> claimant takes or has taken to alleviate pain or other symptoms;
> 5.       Treatment, other than medication, the claimant receives or has received for

relief of pain or other symptoms;

6.      Any measure other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p)

In evaluating the persuasiveness of the testimony, the undersigned notes that the claimant described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  In addition to the activities described in the testimony of the claimant and her daughter, the claimant completed a function report in which she indicated that she: dusts (Exhibit 6E3); goes out alone; and manages money (Exhibit 6E4).  She also reported that she is able to care for her personal needs, including bathing, dressing, and using the restroom (Exhibit 13F2).  Overall, the claimant's actual daily activities reveal a significantly greater functional ability than alleged.

In addition, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.  Indeed, the claimant testified that she is not currently taking any prescription medication.  She also admitted that is not presently receiving any treatment for her physical or mental impairments.  Though the claimant went on to explain that she is unable to afford medication or other treatment (hearing record), it is well settled that an inability to afford medical treatment does not equate to a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 95 (5th Cir. 1989).

There is also evidence that the claimant has disregarded medical advice.  Specifically, she admitted at the hearing that she continues to wear a brace on her left wrist, though her doctors have explicitly told her not to (hearing record).

Also notable, the claimant failed to show up for at least two medical appointments throughout the record (Exhibit 1F9, 12).  These "no-shows" suggest that the claimant's symptoms may not have been as limiting as alleged in connection with this application.

Moreover, the undersigned notes that there are significant inconsistencies between the claimant's statements on the record.  For example, the claimant testified that her doctors would like to perform a third surgery on her left wrist (hearing record).  However, it was clearly noted in February 2010 that the claimant was "not a surgical candidate" and that further treatment was "unnecessary" (Exhibit 17F2).  Such a discrepancy further undermines the claimant's credibility.

(Tr. 29-30).

19

Credibility determinations, such as that made by the ALJ in this case in connection with Gonzalez' subjective complaints, are generally within the province of the ALJ to make.  *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995). Here, the ALJ supported his credibility determination with references to the medical evidence and the testimony about Gonzalez' activities.  While Gonzalez complains that the ALJ relied on improper factors, including her failure to seek treatment, the ALJ's credibility determination was not based solely on Gonzalez' failure to seek treatment.  Rather, the ALJ mentioned Gonzalez' failure to seek treatment as a basis for rejecting any claim that her condition was disabling because she could not afford treatment.  Here, the ALJ's credibility determination was not based on Gonzalez' failure to seek treatment and her inability to afford it, it was based on his assessment that Gonzalez could, despite her complaints of pain and testimony to the contrary, perform work that did not require use of her left hand/arm.  That credibility determination is supported by the record. Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

As of the date of the administrative hearing, Gonzalez was forty-eight (48) years old, had a

20

seventh grade education, and had past work experience as machine operator, which is semi-skilled, medium work. (Tr. 45, 49, 52). The ALJ, having considered Gonzalez' medical records, the objective findings and opinions of the medical experts, and the testimony of Gonzalez and her daughter as to her subjective complaints, determined that Gonzalez had the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot climb ladders, ropes, or scaffolds. She is unable to use her left non-dominant arm. Additionally, she can understand, remember, and carry out detailed but not complex instructions." (Tr. 26). Based on that determination, the ALJ questioned a vocational expert about Gonzalez' ability to do her past relevant work, or any other work which exists in significant numbers in the economy. The vocational expert testified that a person of Gonzalez' age, education and work history, with the RFC found by the ALJ, could not perform her past work, as a machine operator, but would be able to do work as a school bus monitor, an information clerk or a garment sorter. (Tr. 83-84).

Gonzalez argues that the ALJ erred in his RFC assessment because there is no evidence, much less substantial evidence, that she can engage in the lifting requirements of light work (20 pounds occasionally and 10 pounds frequently). Gonzalez further argues that the ALJ erred in his RFC assessment because there is no evidence that her moderate difficulties in maintaining concentration, persistent and pace can be adequately addressed by the ALJ's RFC limitation to work requiring an ability to understand, remember and carry out detailed but not complex instructions.

The ALJ's physical RFC is supported by substantial evidence. The ALJ found that Gonzalez can engage in a limited range of light work, but cannot use her left arm/hand. In so doing, he implicitly concluded that Gonzales could, with her right arm/hand alone, lift 20 pound occasionally and 10 pounds frequently. While Gonzales points to two functional capacity assessments that

21

suggest she cannot lift 20 pounds occasionally with her right arm/hand, the latest of the two assessments contain evidence that she can meet that lifting requirement. (Tr. 297-304). While the assessments were given little weight by the ALJ because "it was unclear whether the examiner(s) had any vocational expertise and Social Security disability standards are not addressed" (Tr. 30), the opinions of both Dr. Xeller and Dr. Costello that Gonzalez should be able to do right handed work generally support the ALJ's determination that she can do such work at a light exertional level. (Tr. 30).[5] Because the record is clear that there is no impairment whatsoever to Gonzalez' dominant right hand/arm and because there is substantial evidence that Gonzalez can do right handed work, the ALJ's physical RFC is supported by substantial evidence.

As for the ALJ's mental RFC, the ALJ's limit on Gonzalez' ability to perform work that requires her to understand, remember and carry out detailed but not complex instructions is consistent with the opinion of Dr. Boulos. In addition, it is not inconsistent withe findings of Dr. Hale, or any other medical evidence or opinion in the record. Because Dr. Boulos found that Gonzalez had  moderate difficulties maintaining concentration, persistence and pace, but could understand, remember, and carry out detailed but not complex instructions, Dr. Boulos' opinion constitutes substantial evidence that supports the ALJ's RFC.

Based on the ALJ's RFC,  which is supported by substantial evidence in the record, and the testimony of the vocational expert as to the availability of jobs that fall within Gonzalez' RFC, this factor also weighs in favor of the ALJ's decision.

---

[5] In addition, there is no evidence that Gonzalez, at the time of administrative hearing on July 28, 2010, after she had completed a work hardening/chronic pain management program in 2009-2010, could not lift 20 pounds occasionally and 10 pounds frequently with her right dominant arm/hand.

## VI.      Conclusion and Order

Based on the foregoing, the conclusion that substantial evidence supports the ALJ's decision, as well as the ALJ's RFC assessment and credibility determination, ad that the ALJ properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 13) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 19) is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

Signed at Houston, Texas, this 22nd day of January, 2013.

Frances H. Stacy
United States Magistrate Judge